## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | |
|---|---|
| GREGORY FLYNT TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **COMPLAINT** |
| ) | **(Jury Trial Demanded)** |
| PETER DUANE DEAVER, in his individual ) | |
| and official capacities, JOSEPH S. TAUB, in ) | |
| his individual and official capacities, MARK ) | |
| NELSON, in his individual capacity, RALPH ) | |
| KEATON, in his individual capacity, and ) | |
| HAROLD ELLIOTT, in his individual ) | |
| capacity, ) | |
| ) | |
| Defendants. ) | |

Plaintiff Gregory Flynt Taylor alleges as follows:

## INTRODUCTION

1.      In April 1993, plaintiff Gregory Flynt Taylor was wrongfully convicted and sentenced to life imprisonment for the murder of Jacquetta Thomas in September 1991.

2.      Taylor served seventeen years in prison for a crime he did not commit.

3.      The critical evidence against Taylor at trial was an official State Bureau of Investigation ("SBI") laboratory report prepared by defendants Peter Duane Deaver and Joseph S. Taub, state agents employed in the Serology Section of the SBI Crime Lab.

4.      In October 1991, Deaver tested a substance on the fender liner of Taylor's truck to determine if it was blood. After a screening test suggested that the substance might be blood, confirmatory serology tests were negative, indicating that the substance was not blood. In their official report, Deaver and Taub intentionally misrepresented the test results, stating that their analysis "gave chemical indications for the presence of blood" and deliberately concealing the negative test results.

5.      Because of the deliberately misleading SBI Report, Taylor was convicted and imprisoned for Jacquetta Thomas' murder in April 1993.

6.     On February 17, 2010, a three-judge panel appointed by the Chief Justice of the North Carolina Supreme Court unanimously found, by clear and convincing evidence, that Taylor was innocent of the charge of murdering Jacquetta Thomas, and ordered his immediate release.

7.     On May 21, 2010, North Carolina Governor Beverly Eaves Perdue granted Taylor a full Pardon of Innocence.

8.     Defendant Mark Nelson served as Chief of the Serology Section of the SBI Crime Lab from 1986 to 2002 and supervised the work of Deaver and Taub. Before and after the Jacquetta Thomas investigation, Nelson knew that Deaver, Taub and other SBI agents frequently misrepresented the results of blood tests, falsely reporting that tests were positive for the presence of blood, when confirmatory test results were in fact negative. Nelson encouraged, condoned and approved this practice.

9.     Defendant Ralph Keaton served as Assistant Director of the SBI Crime Lab from at least 1991 through 1995. Before and after the Jacquetta Thomas investigation, Keaton knew that Deaver, Taub and other SBI agents frequently misrepresented the results of blood tests, falsely reporting that tests were positive for the presence of blood, when confirmatory test results were in fact negative. Keaton encouraged, condoned and approved this practice.

10.     Defendant Harold Elliott served as Director of the SBI Crime Lab from 1986 through 1995. Before and after the Jacquetta Thomas investigation, Keaton knew that Deaver, Taub and other SBI agents frequently misrepresented the results of blood tests, falsely reporting that tests were positive for the presence of blood, when confirmatory test results were in fact negative. Elliott encouraged, condoned and approved this practice.

11.     As a direct result of the defendants' conduct, Taylor sustained physical injuries and sicknesses and other personal injuries. These included, but were not limited to, the following: permanent damage to vision; inadequate medical care; poor nutrition; physical pain and suffering; severe mental anguish; emotional distress; depression; humiliation, indignities and embarrassment; damage to reputation; damage to family relationships; loss of employment, wages and benefits; diminished earning capacity; and restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic opportunity, physical activity, personal fulfillment, parental responsibilities, family relations, sexual relations, access to media and technology, reading, travel, enjoyment, and expression.

12.     Taylor brings this civil rights action against defendants Deaver and Taub in their individual capacities, pursuant to 42 U.S.C. § 1983, for intentionally, in bad faith, producing and submitting misleading evidence against Taylor, while withholding material exculpatory evidence, thereby depriving Taylor of his liberty without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

13.     Taylor also brings this civil rights action against defendants Nelson, Keaton, and Elliott in their individual capacities, pursuant to 42 U.S.C. § 1983, for intentionally, in bad faith,

2

encouraging, condoning and approving the practice of Deaver, Taub and other SBI agents of producing and submitting misleading and incomplete serology reports, thereby depriving Taylor of his liberty without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

14.     Taylor brings this civil rights action against defendants Deaver and Taub in their official capacities, directly under the North Carolina Constitution, for intentionally, in bad faith, producing and submitting misleading evidence against Taylor, while withholding material exculpatory evidence, thereby depriving Taylor of his liberty without due process of law, in violation of Article I, Section 19 and Article I, Section 21 of the North Carolina Constitution.

15.     Finally, Taylor brings this action against defendants in their individual capacities under North Carolina law for the common law torts of obstruction of justice and civil conspiracy.

16.     Taylor seeks to recover compensatory damages under federal and state law from defendants Deaver, Taub, Nelson, Keaton and Elliott in their individual capacities, and from defendants Deaver and Taub in their official capacities.

## JURISDICTION AND VENUE

17.     Taylor brings this civil action under 42 U.S.C. § 1983 for acts committed by defendants under color of state law which deprived Taylor of his liberty without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

18.     Taylor's action arises under the Constitution and laws of the United States.

19.     This Court has original jurisdiction over Taylor's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

20.     This case also arises under the common law of the State of North Carolina.

21.     This Court has pendent jurisdiction over Taylor's state law claims pursuant to 28 U.S.C. § 1367.

22.     All events giving rise to this cause of action occurred in Wake County, North Carolina.

23.     Upon information and belief, defendant Deaver resides in Wake County, North Carolina.

24.     Upon information and belief, defendant Taub resides in Pitt County, North Carolina.

25.     Upon information and belief, defendant Nelson resides in the vicinity of Washington, D.C.

26. Upon information and belief, defendant Keaton resides in Wake County, North Carolina.

27. Upon information and belief, defendant Elliott resides in Wake County, North Carolina.

28. Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Eastern District of North Carolina.

## PARTIES

29. Plaintiff Gregory Flynt Taylor is a citizen and resident of Durham County, North Carolina. Taylor was born on April 11, 1962, and is now 49 years old. Before he was imprisoned in 1993, Taylor was a resident of Wake County, North Carolina.

30. Upon information and belief, defendant Peter Duane Deaver is a citizen and resident of Wake County, North Carolina. From 1985 until January 2011, Deaver was employed by the SBI. From 1986 to 1993, Deaver worked as a serologist and bloodstain pattern analyst in the Serology Section (also known as the Molecular Genetics Section and the Forensic Biology Section) of the SBI Crime Lab. Deaver is named as a defendant in his individual and official capacity for acts taken under color of state law, within the course and scope of his employment with the SBI.

31. Upon information and belief, defendant Joseph S. Taub is a citizen and resident of Pitt County, North Carolina. From 1974 to 2004, Taub was employed by the SBI. During most of that time, including 1986 to 2002, Taub worked as a serologist and bloodstain pattern analyst in the Serology Section of the SBI Crime Lab. Taub is named as a defendant in his individual and official capacity for acts taken under color of state law, within the course and scope of his employment with the SBI.

32. Upon information and belief, defendant Mark Nelson resides in the vicinity of Washington, D.C. From 1972 to 2002, Nelson was employed by the SBI. From 1986 to 2002, Nelson was Chief of the Serology Section of the SBI Crime Lab. Nelson is named as a defendant in his individual capacity for acts taken under color of state law, within the course and scope of his employment with the SBI.

33. Upon information and belief, defendant Ralph Keaton is a citizen and resident of Wake County, North Carolina. From at least 1991 to 1995, Keaton was employed by the SBI and was Assistant Director of the SBI Crime Lab. Keaton is named as a defendant in his individual capacity for acts taken under color of state law, within the course and scope of his employment with the SBI.

34. Upon information and belief, defendant Harold Elliott is a citizen and resident of Wake County, North Carolina. From 1986 to 1995, Elliott was employed by the SBI and was Director of the SBI Crime Lab. Elliott is named as a defendant in his individual capacity for acts taken under color of state law, within the course and scope of his employment with the SBI.

35.     At all times pertinent to this action, defendants Deaver, Taub, Nelson, Keaton and Elliott were acting within the course and scope of their employment, and under color of state law.

## FACTS

### A. Taylor is Arrested for the Murder of Jacquetta Thomas

36.     The allegations in the preceding paragraphs are incorporated herein by reference.

37.     In September 1991, Taylor was 29 years old. He and his wife Becky and their 8-year old daughter Kristen lived in Cary, North Carolina. Taylor had a well-paying job as a switch technician with BTI, a telecommunications company.

38.     At about 7:30 a.m. on September 26, 1991, an officer of the Raleigh Police Department ("RPD") found the body of a woman in a cul-de-sac at the end of South Blount Street in downtown Raleigh. The woman, later identified as Jacquetta Thomas, had been brutally beaten and murdered.

39.     At about 8:30 a.m., Taylor, driven by his wife and accompanied by his boss, arrived at the South Blount Street cul-de-sac to retrieve his Pathfinder truck, which was stuck in mud near a dirt path about 100 yards beyond the end of the cul-de-sac.

40.     Taylor told the police officers at the scene that he had come for his truck. At their request, he agreed to speak to RPD detectives, and his wife drove him to the downtown police station.

41.     At the police station, RPD detectives Johnny Howard and W.T. Liles began questioning Taylor at about 9:30 a.m., and concluded their interrogations at about 6:15 p.m. Without the assistance of an attorney, although he requested an attorney four times, Taylor truthfully told the detectives the following: he had spent the previous night in the company of Johnny Beck, buying and smoking crack cocaine; at about 2:30 a.m., with Beck as a passenger, Taylor had driven his truck to the end of the Blount Street cul-de-sac, and then down a dirt path to find a secluded place to park and smoke crack cocaine; after they had consumed the cocaine, Taylor started driving and the truck bottomed out in a deep rut; Taylor decided to leave the truck and retrieve it in the morning; at about 4:00 a.m., as Beck and Taylor were walking out, they saw what looked like a body on the pavement to their right; they had not seen the body when they drove into the cul-de-sac about an hour and a half earlier; they continued walking and eventually hitched a ride with a woman named Barbara Ray, who brought them to a place where they could buy more crack cocaine; after consuming more crack cocaine with Beck, Taylor called his wife at about 7:00 a.m., and she came to pick him up and bring him home.

42.     From the beginning of Taylor's interrogation, detectives Howard and Liles repeatedly accused Taylor of having murdered Thomas. They falsely told Taylor that Beck, who was being interrogated separately, had accused Taylor of murdering Thomas. They falsely told Taylor that blood had been found on his truck. After warning Taylor that he faced life

imprisonment or the death penalty, they repeatedly invited him to save himself by blaming Beck for the murder. Taylor refused to implicate Beck: throughout the interrogations, Taylor consistently and truthfully said that both he and Beck were innocent.

43. After the interrogations were concluded, Taylor was arrested and charged with the murder of Jacquetta Thomas. Late in the evening of September 26, 1991, Taylor was incarcerated in the Wake County Jail. He remained in jail until December 18, 1991, when he was released on bond to await trial.

## B. SBI Agents Deaver and Taub Intentionally Misrepresent Blood Test Results

44. After Taylor was arrested and charged with Thomas' murder, the RPD and the City-County Bureau of Identification ("CCBI") worked together to develop the case against Taylor.

45. The RPD and CCBI had little evidence against Taylor, other than the presence of his truck near the scene of the crime. Taylor and Beck, who were interrogated separately, had each denied any involvement in Thomas' murder, and had each refused to blame the other. Although Thomas' body was bloody and beaten, with defensive wounds showing that she had struggled for her life, there was no blood on Beck's or Taylor's clothing, and no scratches or injuries on their bodies. No physical evidence connected Beck or Taylor to Thomas. Beck and Taylor did not know Thomas, and neither Beck nor Taylor had a motive to murder her.

46. To bolster the case against Taylor, the RPD and CCBI investigators relied on statements of two witnesses of dubious credibility. Ernest Andrews, a jail inmate hoping for lenient sentencing treatment on his embezzlement charges, claimed that Taylor told him that Beck had murdered Thomas. The "facts" about the crime that Andrews said he learned from Taylor matched those that appeared in a newspaper story, but were inconsistent with the actual evidence. Eva Kelly, a prostitute facing criminal charges who was promised that her sentence would be reduced by half if she testified, claimed she had seen the victim in Kelly's home with Taylor and Beck. Kelly's story was riddled with inconsistencies, and contradicted by her prior statements.

47. Without forensic evidence linking Taylor to Thomas, the State would have been compelled to dismiss the charges against him.

48. On October 1, 1991, in an effort to link Taylor and Beck to Thomas, CCBI agent Don Pagani submitted dozens of items to the SBI Crime Lab for analysis. These items included: the fender liner from Taylor's truck; a cigarette butt found in the truck; an SBI Sexual Assault Evidence Collection Kit ("rape kit") collected from Thomas' body; a dried blood sample from Thomas' body; Thomas' clothing; an SBI Suspect Evidence Collection Kit from Taylor, including blood, saliva and pubic and head hair samples; and an SBI Suspect Evidence Collection Kit from Beck.

49. The SBI assigned Special Agents defendant Deaver and defendant Taub, serology and blood pattern analysts in the Serology Section of the Crime Lab, to perform a laboratory analysis of the items that Pagani submitted.

50. Deaver and Taub had already been involved in the investigation of Thomas' murder. On September 26, the day of the murder, Taub, in his role as Assistance Supervisor for the SBI Crime Lab, assigned Deaver to visit the crime scene. After speaking with CCBI investigators, Deaver observed the pattern of blood stains on and around Thomas' body.

51. Between October 11 and October 25, Deaver tested several items submitted by the CCBI for the presence of blood.

52. To determine if a substance is blood, serologists in 1991 (before the advent of DNA testing) performed a sequence of tests. First, they performed a screening test, commonly referred to as a "presumptive test," typically using phenolphthalein. A positive result on a phenolphthalein test indicates that the substance might be blood. Many substances other than blood can produce a positive result on a phenolphthalein test. To determine if a substance is in fact blood, confirmatory testing is necessary.

53. After a positive result on the phenolphthalein screening test, serologists in 1991 performed a Takayama test to determine if the substance was in fact blood.

54. If the Takayama test was positive, serologists in 1991 sometimes performed an Ouchterlony test to determine if the blood was human.

55. Among the items submitted by the CCBI to the SBI for laboratory analysis was the fender liner from Taylor's truck, identified as Item # 16.

56. Deaver obtained a positive phenolphthalein result on a red-brown substance on Item # 16, indicating that the substance might be blood.

57. Deaver then performed a Takayama test on the red-brown substance on Item # 16. The Takayama test on Item # 16 was negative, indicating that the substance on Taylor's fender liner was not blood.

58. Another item submitted by the CCBI to the SBI for laboratory analysis was a thread sample stained with the red-brown substance from the fender. The stained thread sample was identified as Item # 18.

59. Deaver obtained a positive phenolphthalein result on the stained thread sample (Item # 18), indicating that the substance might be blood.

60. Deaver then performed a Takayama test on Item # 18. The Takayama test on Item # 18 was negative, indicating that there was no blood on the stained thread sample.

61.     Deaver then performed an Ouchterlony test on Item # 18. The Ouchterlony test was negative, indicating that there was no human blood on the stained thread sample.

62.     When he performed the Takayama test on the fender liner (Item # 16) and the Takayama and Ouchterlony tests on the stained thread sample (Item # 18), Deaver recorded the results in hand-written bench notes ("the bench notes"). The bench notes indicate that the two Takayama tests and the Ouchterlony test were negative ("-").

63.     The substance that Deaver tested on Item # 16 was not blood.

64.     The substance that Deaver tested on Item # 18 was not blood.

65.     Deaver found no forensic evidence linking Taylor or Beck to Thomas.

66.     Deaver found no evidence that Taylor or Beck had ever been in physical contact with Thomas.

67.     Deaver discussed with Taub the tests he performed and the results obtained.

68.     Taub had helped train Deaver in the performance and reporting of serology tests.

69.     Deaver informed Taub that the Takayama and Ouchterlony tests on the substance from the fender liner were negative, indicating that the substance was not blood.

70.     Deaver and Taub prepared a formal typed SBI Laboratory Report ("SBI Report"), purportedly documenting their findings.

71.     In the SBI Report, Deaver and Taub intentionally misrepresented the test results, stating that their examination "gave chemical indications for the presence of blood" on the fender liner of Taylor's truck, when their examination had in fact negated the presence of blood.

72.     In the SBI Report, Deaver and Taub deliberately concealed the negative results of the Takayama and Ouchterlony tests.

73.     In stating that their analysis of the fender liner disclosed "chemical indications for the presence of blood," Deaver and Taub intentionally reported misleading evidence, falsely linking Taylor to Thomas' murder.

74.     At the bottom of the first page of the SBI Report, Deaver and Taub affirmed: "This report represents a true and accurate result of my analysis of the item(s) described."

75.     With respect to Deaver's analysis of the substance on the fender liner of Taylor's truck, the affirmation by Deaver and Taub was false. At the time they made the affirmation, Deaver and Taub knew it was false.

76. Deaver and Taub knowingly and intentionally prepared a misleading and incomplete laboratory report.

77. On November 7, 1991, Deaver and Taub submitted the SBI Report to the CCBI.

78. When they submitted the SBI Report to the CCBI, Deaver and Taub did not submit Deaver's bench notes documenting the negative results of the Takayama and Ouchterlony tests.

79. When they submitted the SBI Report to the CCBI, Deaver and Taub did not inform the CCBI that Deaver had conducted confirmatory tests, and that the confirmatory tests negated the presence of blood.

80. By submitting the misleading and incomplete laboratory report, Deaver and Taub intended to strengthen the case against the suspect Taylor by creating an apparent link between him and the victim Thomas.

81. By stating in the SBI Report that the analysis "gave chemical indications for the presence of blood," without indicating that confirmatory tests in fact negated the presence of blood, Deaver and Taub misled those who would foreseeably rely on the report, including the CCBI, the RPD, the prosecutors, the defense attorneys, the witnesses, the judge and the jury.

## C. SBI Section Chief Nelson, Assistant SBI Lab Director Keaton, and SBI Lab Director Elliott Encourage and Approve the Intentional Reporting of Misleading Evidence

82. Defendant Mark Nelson served as Chief of the Serology Section ("the Section") of the SBI Crime Lab from 1986 to 2002 and supervised the work of Deaver and Taub.

83. Defendant Ralph Keaton served as Assistant Director of the SBI Crime Lab from at least 1991 to 1995 and oversaw the work of Deaver and Taub.

84. Defendant Harold Elliott served as Director of the SBI Crime Lab from 1986 to 1995 and oversaw the work of Deaver and Taub.

85. The role of a forensic laboratory is to be an objective reporter of facts to all components of the criminal justice system.

86. An independent audit report, released in August 2010, correctly found that Nelson, as Section Chief, undermined the objective role of the forensic laboratory by promoting a "mindset ... that the lab's customer was law enforcement and reported results should be tailored primarily for law enforcement's consumption."

87. As Section Chief and as Deaver's and Taub's direct supervisor, Nelson knew, before, during and after November 7, 1991, that Deaver and Taub had a practice of producing and submitting official SBI laboratory reports that falsely indicated the presence of blood, while concealing the negative results of confirmatory tests.

88. As Crime Lab Assistant Director, Keaton knew, before, during and after November 7, 1991, that Deaver and Taub had a practice of producing and submitting official SBI laboratory reports that falsely indicated the presence of blood, while concealing the negative results of confirmatory tests.

89. As Crime Lab Director, Elliott knew, before, during and after November 7, 1991, that Deaver and Taub had a practice of producing and submitting official SBI laboratory reports that falsely indicated the presence of blood, while concealing the negative results of confirmatory tests.

90. From 1986 until 1997, the Section had no written policy or standard practice for reporting the results of serology tests.

91. In the absence of a written policy or standard practice, serologists in the Section used inconsistent methods of reporting the results of laboratory tests. When the analysis of a blood sample yielded a positive result on a presumptive test (e.g., phenolphthalein) and a negative result on a confirmatory test (e.g., Takayama), some analysts in the Section included a qualifying sentence in the official laboratory report stating that "additional tests failed to detect the presence of blood." That sentence informed users of the report that confirmatory tests were performed and that the confirmatory tests were negative.

92. While some serologists in the Section properly disclosed negative results of confirmatory tests, under the exact same circumstances, Deaver, Taub and other analysts routinely prepared and submitted official laboratory reports that disclosed only the positive result of the presumptive test, and concealed the negative result of the confirmatory test.

93. Before submitting his serology report in the Jacquetta Thomas case on November 7, 1991, Deaver, working under the supervision of Nelson, Keaton and Elliott, produced and submitted many similar misleading serology reports, including, but not limited to, the following:

    a. Michael Hampton Hammock pled guilty to second degree murder on December 14, 1988 after Deaver falsely reported that "further analysis of the stain yielded inconclusive results." In fact, Deaver obtained a negative result on a Takayama test.

    b. Joe Russell Bright pled guilty to second degree murder on July 16, 1991 after Deaver falsely reported that "further testing yielded inconclusive results." In fact, Deaver obtained a negative result on a Takayama test.

    c. Keith Watts, charged with rape, pled guilty to assault on a female on January 3, 1990 after Deaver falsely reported that examination of the item "gave chemical indications for the presence of blood though the quantity was insufficient to test further." In fact, the quantity was sufficient for Deaver to perform a Takayama test, which was negative for the presence of blood.

d.      John Hardy Rose was convicted of first degree murder and sentenced to death on May 8, 1992 after Deaver falsely reported that the tested items "gave chemical indications for the presence of blood though the quantity of the stain is insufficient to test further." In fact, the quantity was sufficient for Deaver to perform a Takayama test, which was negative for the presence of blood. Rose was executed on November 30, 2001.

e.      Arthur Martin Vause, Jr. was convicted of first degree murder on February 13, 1990 after Deaver misleadingly reported "chemical indications for the presence of blood," and failed to report the negative results of Takayama and Ouchterlony tests.

f.      Tony Lamont Faison was convicted of first degree murder on July 27, 1989 after Deaver misleadingly reported "chemical indications for the presence of blood," and failed to report the negative results of Takayama and Ouchterlony tests.

g.      Ronald Thomas was convicted of first degree murder on March 12, 1991 after Deaver misleadingly reported "chemical indications for the presence of blood," and failed to report the negative results of Takayama and Ouchterlony tests.

94.      Nelson, Keaton and Elliott encouraged, condoned and approved the practice of Deaver, Taub and other analysts of creating and submitting official SBI laboratory reports that falsely indicated the presence of blood, while concealing the negative results of confirmatory tests.

95.      Nelson, Keaton and Elliott knew and intended that this practice, described in paragraphs 92-94 above, created a systematic bias in favor of the prosecution and against criminal defendants.

96.      Nelson, Keaton and Elliott knew and intended that this practice, described in paragraphs 92-94 above, routinely resulted in the provision of false information to the prosecution and defense counsel.

97.      Nelson, Keaton and Elliott knew and intended that this practice, described in paragraphs 92-94 above, routinely resulted in the failure to disclose material and exculpatory evidence to the prosecution and defense counsel.

98.      Nelson, Keaton and Elliott knew or should have known that this practice, described in paragraphs 92-94 above, violated the federal constitutional rights of criminal defendants.

**D. The State Uses the Intentionally Misleading "Blood" Evidence to Convict Taylor**

99.      Taylor was tried for the murder of Jacquetta Thomas in Wake County Superior Court in April 1993.

100.     At Taylor's trial, the State introduced the SBI Report into evidence to establish that blood was present on Taylor's truck. The State introduced no other laboratory evidence linking Taylor to the victim.

101.     After introducing the SBI Report into evidence, the prosecutor, Assistant District Attorney Tom Ford ("ADA Ford") and prosecution witnesses repeatedly referred to the "blood" that was found on Taylor's truck.

102.     In closing argument, ADA Ford referred to the "blood" on Taylor's truck as evidence that Taylor had murdered Thomas.

103.     On April 19, 1993, the jury found Taylor guilty of first degree murder, and Judge J.B. Allen, Jr., imposed a life sentence.

104.     The "blood" evidence was a decisive factor in the jury's determination that Taylor was guilty of murder.

### E. Deaver and Taub Remain Silent While Taylor Serves Seventeen Years in Prison for a Crime He Did Not Commit

105.     On October 1, 1991, when Taylor was confined in the Wake County Jail, detective Howard of the RPD interviewed Chris Bunn, a friend of Taylor's. Near the end of the interview, Howard turned the tape recorder off and said: "We know the nigger [i.e., Beck] did it. I can get you in to see him [Taylor], and if you get him to tell me that this nigger did it, we'll turn him loose."

106.     During trial, ADA Ford informed Taylor, through Taylor's attorney, that Taylor could still save himself by testifying against Beck.

107.     The day Taylor was convicted, ADA Ford informed Taylor's attorney that Ford and Judge Allen would intercede with the Governor to reduce Taylor's time in prison if Taylor would implicate Beck in Thomas' murder. Because Taylor knew that Beck was also innocent, Taylor refused Ford's offer.

108.     In a letter to Taylor's attorney dated July 12, 1993, ADA Ford offered to assist Taylor in obtaining a reduction in his sentence if he would testify against Beck when Beck was tried for Thomas' murder. Because Taylor knew that Beck was innocent, Taylor refused Ford's offer.

109.     On August 12, 1993, ADA Ford wrote Taylor's attorney to reiterate that he would have to dismiss Beck's charges without Taylor's cooperation. Ford said he would consider reopening Taylor's case if Taylor decided to be "truthful" about Beck.

110.     On August 18, 1993, ADA Ford dismissed all charges against Beck. In a form explaining the dismissal of the charges, Ford admitted that the evidence against Beck was insufficient "to survive nonsuit." The only evidence that Ford cited as being admissible against

Taylor and not against Beck was the testimony of Ernest Andrews, the embezzler who falsely claimed that Taylor had confessed to driving the truck when Beck killed the victim.

111. In 1995, an RPD officer visited Taylor in prison and told Taylor that it wasn't too late to testify against Beck and that his testimony against Beck was the only thing that could get him home. Taylor refused.

112. Several years later, ADA Ford again suggested to Taylor's post-conviction attorney that Taylor could obtain his freedom in exchange for implicating Beck.

113. Taylor was confined in the Wake County Jail for almost three months, from September 26, 1991 to December 18, 1991. While Taylor was in the Wake County Jail, he was never cited for a disciplinary infraction.

114. Immediately after his conviction on April 19, 1993, Taylor was incarcerated in Central Prison in Raleigh.

115. In June 1993, Taylor was transferred to Nash Correctional Institution.

116. In November 2000, Taylor was transferred to Johnston Correctional Institution, where he remained until February 2010.

117. During the sixteen years, nine months and twenty-eight days that he was in prison from 1993 to 2010, Taylor was never cited for a disciplinary infraction.

118. After Deaver submitted the SBI Report that he knew was incomplete and misleading, Deaver had a continuing obligation as an SBI employee to correct it. That obligation began on November 7, 1991 and continued every day, month and year that Taylor was in jail, out on bond, or in prison, as long as Deaver was employed by the SBI. Deaver was continuously employed by the SBI from November 7, 1991 to January 2011.

119. After Taub submitted the SBI Report that he knew was incomplete and misleading, Taub had a continuing obligation as an SBI employee to correct it. That obligation began on November 7, 1991 and continued every day, month and year Taylor was in jail, out on bond, or in prison, as long as Taub was employed by the SBI. Taub retired from the SBI in 2004.

120. From November 7, 1991 until August 2009, Deaver and Taub did not disclose that Deaver had performed confirmatory tests on Item # 16 and Item # 18, and that those tests were negative for the presence of blood.

121. From November 7, 1991 until February 2010, Deaver and Taub never corrected the SBI Report.

122.    If Deaver or Taub had corrected the laboratory report and disclosed the negative results of the confirmatory tests before Taylor was tried in April 1993, the charges against Taylor would have been dismissed and Taylor would have avoided almost seventeen years in prison.

123.    In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008 and 2009, if Deaver or Taub had corrected the laboratory report and disclosed the negative results of the confirmatory tests, Taylor would have obtained post-conviction relief and avoided additional time in prison.

## F. When the Truth Is Finally Revealed, Taylor Is Set Free

124.    Taylor pursued every available avenue to challenge his conviction, including a direct appeal to the North Carolina Supreme Court, a motion for appropriate relief in Wake County Superior Court, a petition for writ of certiorari to the North Carolina Supreme Court, a petition for writ of habeas corpus in the United States District Court for the Eastern District of North Carolina, an appeal to the Fourth Circuit Court of Appeals, a petition for writ of certiorari to the United States Supreme Court, a motion for DNA testing in Wake County Superior Court, and a petition for writ of certiorari to the North Carolina Court of Appeals.

125.    At every stage of his appeals and requests for post-conviction relief, Taylor maintained his innocence.

126.    In responding to Taylor's appeals and requests for post-conviction relief, the State cited the SBI Report as evidence of Taylor's guilt.

127.    The state and federal courts rejected each of Taylor's appeals and each of his requests for post-conviction relief. In doing so, the courts relied on the SBI Report as evidence of Taylor's guilt.

128.    In August 2006, the North Carolina General Assembly established the North Carolina Innocence Inquiry Commission ("the Commission") to investigate and evaluate post-conviction claims of factual innocence.

129.    On July 23, 2007, the North Carolina Center on Actual Innocence referred Taylor's case to the Commission for review.

130.    In September 2007, pursuant to N.C.G.S. § 15A-1467, Taylor made a claim of factual innocence to the Commission, and executed a Waiver of Procedural Safeguards and Privileges and Consent to Formal Inquiry.

131.    In August 2009, after a two-year investigation, the Commission scheduled a hearing for September 3-4, 2009 to hear evidence in Taylor's case.

132.    Wake County District Attorney Colon Willoughby assigned ADA Ford to represent the State in the inquiry before the Commission.

133. To prepare for the formal hearing, Ford conducted a face-to-face interview with Deaver in August 2009.

134. At the interview, Deaver showed Ford the bench notes from the serology tests he performed in the Thomas case in October 1991.

135. Soon after meeting with Deaver in August 2009, Ford informed Kendra Montgomery-Blinn, Executive Director of the Commission, that Deaver performed confirmatory tests for the presence of blood on Taylor's truck before Taylor's original trial, that these tests yielded negative results, and that the confirmatory tests were not mentioned in the final laboratory report.

136. The SBI provided Deaver's bench notes to the Commission in July 2008 pursuant to a discovery order.

137. On September 3 and 4, 2009, pursuant to N.C.G.S. § 15A-1468, the Commission conducted a hearing to consider Taylor's claim of innocence. Ten witnesses testified.

138. On September 3, 2009, Deaver testified under oath at the Commission hearing. Near the end of Deaver's testimony, Commissioner Charles Becton asked him a series of questions about the serology tests that Deaver performed in October 1991:

> Q. But what you tested, Special Agent Deaver, was the fender liner, the thread sample taken from the fender liner, the thread sample taken from the A frame; those are the three areas that you tested, is that correct?

> A. That were submitted to me, yes.

> Q. That was 16, 17, and 18?

> A. I believe that's correct.

> Q. And as I understand it, 16 and 18 gave preliminary indications of blood, but you could not do test number two --

> A. *That's correct*.

> Q. – to show that it was blood or test number three to show if it was blood, it was human blood.

> A. *That's correct.*

139. The answers that Deaver gave to Commissioner Becton were false and deliberately misleading. In fact, Deaver had performed "test number two" [the Takayama test] on Item # 16 and # 18, and both Takayama tests were negative for the presence of blood. In fact,

Deaver had performed "test number three" [the Ouchterlony test] on Item # 18, and that test was also negative.

140.    At the Commission hearing, Meghan Clement, a forensic scientist with LabCorp Inc., testified that she performed advanced DNA testing of Items #16 and #18 and found DNA quantities of 0.000%, definitively proving that the substances noted on those items in 1991 were not human blood.

141.    At the end of the hearing, the eight members of the Commission concluded unanimously that there was sufficient evidence of factual innocence to merit judicial review.  As a result, pursuant to N.C.G.S. § 15A-1468(c), Taylor's claim was referred to the Senior Resident Superior Court Judge in Raleigh.

142.    On September 8, 2009, pursuant to N.C.G.S. § 15A-1469, the Chair of the Commission, Judge Quentin Sumner, asked the Chief Justice of the North Carolina Supreme Court, Sarah Parker, to appoint a three-judge panel to hear and rule on Taylor's claim of innocence.

143.    In October 2009, the Commission provided to Taylor's lawyers the files the Commission had obtained in discovery, including Deaver's bench notes.

144.    Chief Justice Parker appointed the three-judge panel, consisting of three superior court judges:  Howard E. Manning, Jr., Tanya T. Wallace, and Calvin E. Murphy.

145.    From February 9 through 17, 2010, the three-judge panel held an evidentiary hearing to consider Taylor's claim of innocence.  As the senior member of the panel, Judge Manning presided.

146.    Deaver testified before the three-judge panel on February 12, 2010.  In his testimony, Deaver acknowledged that he had performed confirmatory tests on Items 16 and 18, that the tests were negative, and that he had not reported the negative test results in his official laboratory report.

147.    At the hearing, Deaver testified that the way he prepared the SBI Report "was required by SBI policy and procedure," that standard protocol required him to report a positive presumptive test and not disclose the results of negative confirmatory tests, and that the particular wording used in the SBI Report was decided "[a] lot higher than my pay grade."

148.    On February 17, 2010, the three-judge panel issued its decision.  Each of the three judges ruled that "Gregory F. Taylor has proved by clear and convincing evidence that Gregory F. Taylor is innocent of the charge of first degree murder of Jacquetta Thomas on September 26, 1991."

149.    Based on its unanimous decision, and pursuant to N.C.G.S. § 15A-1469, the three-judge panel ordered that the charge against Taylor be dismissed, and ordered his immediate release.

150.    Taylor was released on February 17, 2010.

151.    At the conclusion of the hearing, District Attorney Willoughby said to Taylor: "I'm sorry you were convicted. I wish we'd had the evidence in 1991."

152.    After Taylor was released, Keaton stated publicly that the type of language that Deaver used in the SBI Report was never acceptable, and that "the report should have clarified that confirmatory tests were negative."

153.    After Taylor's release, the RPD requested that LabCorp conduct additional sensitive DNA testing of Taylor's clothing, Beck's clothing, and the victim's clothing to determine if further testing would reveal any link between Taylor, Beck, and Thomas. All those tests were negative.

154.    On May 21, 2010, after waiting for the DNA test results, North Carolina Governor Beverly Eaves Perdue granted Taylor a full Pardon of Innocence.

## G. An Independent Audit Confirms that the Creation of False and Misleading Reports Was a Common Practice in the Serology Section

155.    After Taylor's exoneration, North Carolina Attorney General Roy Cooper ordered an independent audit of the Serology Section of the SBI Crime Lab.

156.    To perform the audit, Cooper retained former FBI agents Chris Swecker and Michael Wolf. Swecker is a former Assistant Director of the FBI's Criminal Investigative Division. At the time of his retirement in 2006, Swecker headed nine FBI divisions, including the FBI Laboratory.  Wolf served in the FBI Laboratory as an Analyst before becoming an FBI Special Agent.  Wolf retired as Assistant Director of the FBI's Crisis Response Division in 2008.

157.    On August 18, 2010, Swecker and Wolf issued their report, titled "An Independent Review of the SBI Forensic Laboratory" ["the Audit Report"].

158.    Swecker and Wolf identified 15,419 lab files from January 1987 through January 2003 containing one or more serology tests.

159.    Within that group of 15,419 files, Swecker and Wolf identified 930 files that included final test results with the phrases "indications of blood" or "chemical indications for the presence of blood."  Of those 930 files, a total of 229 files, including seven death penalty cases, contained at least one instance where the lab notes reflected that a positive presumptive test for the presence of blood was followed by a confirmatory test yielding results that were "negative," "inconclusive," or "no result," but did not include this information in the final report.

160.    The Audit Report identified Deaver as having performed the serology tests in 33 of the 229 problematic cases, in addition to the Taylor case.

161.   The Audit Report identified Taub as having performed the serology tests in 9 of the 229 problematic cases.

162.   The Audit Report identified three categories of cases -- Category 2, Category 3, Category 4 -- that were especially problematic.  In those cases, the analyst reported only the positive results of a presumptive test, and concealed the fact that the analyst had performed a confirmatory test and that the confirmatory test was negative.

163.   According to the Audit Report, for offenses occurring from June 21, 1986, through October 30, 1992, Deaver submitted 33 official laboratory reports (including the SBI Report in Taylor's case) that were classified in the three aggravated categories (i.e., the analyst reported only the positive results of a presumptive test, and concealed the fact that the analyst had performed a confirmatory test and that the confirmatory test was negative).

164.   The Audit Report classified 97% (33/34) of Deaver's problematic test reports, all for offenses occurring from June 21, 1986, through October 30, 1992, in the three aggravated categories (Category 2, 3 or 4).  During the same period, 96% (25/26) of analyst Brenda Bissette's problematic test reports and 100% (15/15) of analyst Lucy Milk's problematic test reports were classified in the three aggravated categories.

165.   During the same period, the Audit Report classified only 4% (2/51) of analyst David Spittle's problematic test reports in the three aggravated categories.  All but two of Spittle's problematic test reports were classified in the first category, in which the analyst failed to mention the negative results of confirmatory tests, but did state that tests for the presence of blood were not conclusive.

166.   The Audit Report classified the problematic files in four categories, by degree of severity of the analyst's misrepresentation, and cited Deaver as a uniquely serious offender: "The fourth and most serious category involves cases in which the reported actual results of the confirmatory tests were over reported or not reflective of the results contained in the lab notes. There were five such cases in this category, all handled by SA Deaver."

167.   The Audit Report identified two cases in which Deaver falsely "reported that the test results '*revealed the presence of blood*' despite the fact that the confirmatory test was noted as negative ('T-') in his lab notes."  (Emphasis in original). The Audit Report stated that "the misreporting of the confirmatory test in that fashion is unacceptable." It noted that Deaver was the only analyst in the Section guilty of making this extreme misrepresentation.

168.   The Audit Report characterized as "inaccurate" Deaver's testimony before the three-judge panel that he was simply following SBI "policy" when he concealed the negative results of the confirmatory tests in Taylor's case.

169.   Contrary to Deaver's testimony before the three-judge panel, the Audit Report found that the Serology Section had no written policy on how to report test results in 1991. Instead, the Audit Report found that it was "the sanctioned <u>practice</u> of some NC SBI Laboratory

Analysts at the time to omit the results of certain negative or inconclusive confirmatory tests in final lab reports under certain circumstances." (Emphasis in original).

170.    The Audit Report found that the practice of some analysts was systematically biased against criminal defendants: the analysts often omitted negative results of confirmatory tests; "Conversely, during the same time period positive presumptive and confirmatory tests were always included in the final laboratory reports. The import of such omissions was that anyone using these report results would not know that subsequent and more sensitive laboratory tests had been conducted on the same evidence item and that the results of those tests were negative or inconclusive"

171.    The Audit Report summarized the practice's destructive impact on the criminal justice system: "The practice of not reporting the results of certain confirmatory tests created conditions under which negative laboratory serology test results which may have been material and/or exculpatory to the defense were not identified to either the prosecution or defense counsel."

172.    According to Attorney General Roy Cooper, the Audit Report "describes a practice that should have been unacceptable then and is not acceptable now."

## CAUSES OF ACTION

## I. FEDERAL LAW

### A. CLAIMS UNDER 42 U.S.C. § 1983 AGAINST DEAVER FOR VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

COUNT I:  INTENTIONAL MISREPRESENTATION OF EVIDENCE (DEAVER)

172.    The allegations in the preceding paragraphs are incorporated herein by reference.

173.    Deaver intentionally and in bad faith misrepresented evidence against Taylor by creating and submitting the SBI Report in 1991 that falsely linked Taylor to the victim Jacquetta Thomas.

174.    In intentionally misrepresenting evidence against Taylor, Deaver acted with reckless indifference to Taylor's constitutional rights.

175.    When Deaver intentionally misrepresented evidence against Taylor, Deaver could reasonably foresee that the misrepresentation would result in Taylor's conviction.

176.    Deaver's intentional misrepresentation of evidence against Taylor was a direct and proximate cause of Taylor's conviction and his subsequent imprisonment.

177. Because Deaver intentionally misrepresented evidence against Taylor, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

178. Deaver was acting under color of state law when he intentionally misrepresented evidence against Taylor.

179. Deaver's intentional misrepresentation of evidence deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

180. Because Deaver intentionally misrepresented evidence against Taylor, Deaver is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

181. In 1992 and continuing through Taylor's trial in April 1993, Deaver, acting under color of state law, intentionally and in bad faith failed to correct the incomplete and misleading SBI Report. If he had done so, the charges against Taylor would have been dismissed or Taylor would not have been convicted, and Taylor would have avoided almost seventeen years in prison.

182. In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008 and 2009, Deaver, acting under color of state law, intentionally and in bad faith failed to correct the incomplete and misleading SBI Report. If he had done so, Taylor would have obtained post-conviction relief and avoided additional time in prison.

183. Deaver's intentional failure to correct the incomplete and misleading SBI Report from 1992 through 2009 deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

184. Because Deaver intentionally failed to correct the incomplete and misleading SBI Report from 1992 through 2009, in reckless indifference to Taylor's constitutional rights, Deaver is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

COUNT II: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (DEAVER)

185. The allegations in the preceding paragraphs are incorporated herein by reference.

186. Deaver intentionally and in bad faith withheld material exculpatory evidence by failing to disclose in the 1991 SBI Report that, after obtaining a positive result on presumptive serology tests, he obtained negative results on confirmatory tests, refuting the link he reported between Taylor and Thomas.

187. In withholding exculpatory evidence, Deaver acted with reckless indifference to Taylor's constitutional rights.

188.    When Deaver withheld the exculpatory evidence, he could reasonably foresee that the failure to disclose the evidence would result in Taylor's conviction.

189.    Deaver's intentional withholding of exculpatory evidence was a direct and proximate cause of Taylor's conviction and his subsequent imprisonment.

190.    Because Deaver intentionally withheld exculpatory evidence, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

191.    Deaver was acting under color of state law when he withheld the exculpatory evidence.

192.    Deaver's intentional withholding of exculpatory evidence deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

193.    Because Deaver intentionally withheld exculpatory evidence, Deaver is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

194.    In 1992 and continuing through Taylor's trial in April 1993, Deaver, acting under color of state law, intentionally and in bad faith withheld the exculpatory results of the confirmatory tests.  If he had disclosed the exculpatory evidence, the charges against Taylor would have been dismissed or Taylor would not have been convicted, and Taylor would have avoided almost seventeen years in prison.

195.    In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008 and 2009, Deaver, acting under color of state law, intentionally and in bad faith withheld the exculpatory results of the confirmatory tests. If he had disclosed the exculpatory evidence, Taylor would have obtained post-conviction relief and avoided additional time in prison.

196.    Deaver's intentional withholding of the exculpatory evidence from 1992 through 2009 deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

197.    Because Deaver intentionally withheld the exculpatory evidence from 1992 through 2009, in reckless indifference to Taylor's constitutional rights, Deaver is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

**B.  CLAIMS UNDER 42 § U.S.C. 1983 AGAINST TAUB FOR VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

COUNT III:  INTENTIONAL MISREPRESENTATION OF EVIDENCE (TAUB)

198.    The allegations in the preceding paragraphs are incorporated herein by reference.

199. Taub intentionally and in bad faith misrepresented evidence against Taylor by creating and submitting the SBI Report in 1991 that falsely linked Taylor to the victim Jacquetta Thomas.

200. In intentionally misrepresenting evidence against Taylor, Taub acted with reckless indifference to Taylor's constitutional rights.

201. When Taub intentionally misrepresented evidence against Taylor, he could reasonably foresee that the misrepresentation would result in Taylor's conviction.

202. Taub's intentional misrepresentation of evidence against Taylor was a direct and proximate cause of Taylor's conviction and his subsequent imprisonment.

203. Because Taub intentionally misrepresented evidence against Taylor, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

204. Taub was acting under color of state law when he intentionally misrepresented evidence against Taylor.

205. Taub's intentional misrepresentation of evidence deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

206. Because Taub intentionally misrepresented evidence against Taylor, Taub is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

207. In 1992 and continuing through Taylor's trial in April 1993, Taub, acting under color of state law, intentionally and in bad faith failed to correct the incomplete and misleading SBI Report. If he had done so, the charges against Taylor would have been dismissed or Taylor would not have been convicted, and Taylor would have avoided almost seventeen years in prison.

208. In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003 and 2004, Taub, acting under color of state law, intentionally and in bad faith failed to correct the incomplete and misleading SBI Report. If he had done so, Taylor would have obtained post-conviction relief and avoided additional time in prison.

209. Taub's intentional failure to correct the incomplete and misleading SBI Report from 1992 through 2004 deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

210. Because Taub intentionally failed to correct the incomplete and misleading SBI Report from 1992 through 2004, in reckless indifference to Taylor's constitutional rights, Taub is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

COUNT IV:  FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (TAUB)

211.    The allegations in the preceding paragraphs are incorporated herein by reference.

212.    Taub intentionally and in bad faith withheld material exculpatory evidence by failing to disclose in the 1991 SBI Report that, after Deaver obtained a positive result on presumptive serology tests, he obtained negative results on confirmatory tests, refuting the link that Deaver and Taub reported between Taylor and Thomas.

213.    In withholding exculpatory evidence, Taub acted with reckless indifference to Taylor's constitutional rights.

214.    When Taub withheld the exculpatory evidence, he could reasonably foresee that the failure to disclose the evidence would result in Taylor's conviction.

215.    Taub's intentional withholding of exculpatory evidence was a direct and proximate cause of Taylor's conviction and his subsequent imprisonment.

216.    Because Taub intentionally withheld exculpatory evidence, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

217.    Taub was acting under color of state law when he withheld the exculpatory evidence.

218.    Taub's intentional withholding of exculpatory evidence deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

219.    Because Taub intentionally withheld exculpatory evidence, Taub is liable to Taylor in his individual capacity for compensatory damages under 42 U.S.C. § 1983.

220.    In 1992 and continuing through Taylor's trial in April 1993, Taub, acting under color of state law, intentionally and in bad faith withheld the exculpatory results of the confirmatory tests.  If he had disclosed the exculpatory evidence, the charges against Taylor would have been dismissed or Taylor would not have been convicted, and Taylor would have avoided almost seventeen years in prison.

221.    In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003 and 2004, Taub, acting under color of state law, intentionally failed to disclose the exculpatory results of the confirmatory tests. If he had disclosed the exculpatory evidence, Taylor would have obtained post-conviction relief and avoided additional time in prison.

222. Taub's intentional withholding of the exculpatory evidence from 1992 through 2004 deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

223. Because Taub intentionally withheld the exculpatory evidence from 1992 through 2004, in reckless indifference to Taylor's constitutional rights, Taub is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

## C. CLAIMS UNDER 42 U.S.C. § 1983 AGAINST NELSON FOR VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

### COUNT V: INTENTIONAL MISREPRESENTATION OF EVIDENCE (NELSON)

224. The allegations in the preceding paragraphs are incorporated herein by reference.

225. As Chief of the Serology Section, Nelson intentionally and in bad faith encouraged, condoned and approved the practice of some analysts, including Deaver and Taub, of intentionally misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory tests.

226. In encouraging, condoning and approving the practice of Deaver, Taub and other analysts of intentionally misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory tests, Nelson acted with reckless indifference to the constitutional rights of criminal suspects and defendants, including Taylor.

227. When Nelson encouraged, condoned and approved the practice of Deaver, Taub and other analysts of intentionally misrepresenting evidence, he could reasonably foresee that the misrepresentation would result in the wrongful conviction of criminal defendants, including Taylor.

228. Nelson's encouragement, condonation and approval of the practice of intentionally misrepresenting evidence were direct and proximate causes of Taylor's conviction and his subsequent imprisonment.

229. Because Nelson intentionally encouraged, condoned and approved the practice of intentionally misrepresenting evidence, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

230. Nelson was acting under color of state law when he encouraged, condoned and approved the practice of intentionally misrepresenting evidence.

231. By knowingly and intentionally encouraging, condoning and approving the practice of intentionally misrepresenting evidence, Nelson deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

232. Because Nelson knowingly and intentionally encouraged, condoned and approved the practice of intentionally misrepresenting evidence, Nelson is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

COUNT VI: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (NELSON)

233. The allegations in the preceding paragraphs are incorporated herein by reference.

234. As Chief of the Serology Section, Nelson intentionally and in bad faith encouraged, condoned and approved the practice of some analysts, including Deaver and Taub, of withholding material exculpatory evidence by failing to disclose negative results of confirmatory tests.

235. When Nelson encouraged, condoned and approved the practice of Deaver, Taub and other analysts of withholding exculpatory evidence, he could reasonably foresee that the withholding of exculpatory evidence would result in the wrongful conviction of criminal defendants, including Taylor.

236. Nelson's encouragement, condonation and approval of the practice of withholding exculpatory evidence were direct and proximate causes of Taylor's conviction and his subsequent imprisonment.

237. Because Nelson intentionally encouraged, condoned and approved the practice of withholding exculpatory evidence, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

238. Nelson was acting under color of state law when he encouraged, condoned and approved the practice of withholding exculpatory evidence.

239. By knowingly and intentionally encouraging, condoning and approving the practice of withholding exculpatory evidence, Nelson deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

240. Because Nelson knowingly and intentionally encouraged, condoned and approved the practice of withholding exculpatory evidence, in reckless disregard of Taylor's constitutional rights, Nelson is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

**D. CLAIMS UNDER 42 U.S.C. § 1983 AGAINST KEATON FOR VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

COUNT VII: INTENTIONAL MISREPRESENTATION OF EVIDENCE (KEATON)

241. The allegations in the preceding paragraphs are incorporated herein by reference.

242. As Assistant Director of the Crime Lab, Keaton intentionally and in bad faith encouraged, condoned and approved the practice of some analysts, including Deaver and Taub, of intentionally misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory tests.

243. In encouraging, condoning and approving the practice of Deaver, Taub and other analysts of misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory tests, Keaton acted with reckless indifference to the constitutional rights of criminal suspects and defendants, including Taylor.

244. When Keaton encouraged, condoned and approved the practice of Deaver, Taub and other analysts of intentionally misrepresenting evidence, he could reasonably foresee that the misrepresentation would result in the wrongful conviction of criminal defendants, including Taylor.

245. Keaton's encouragement, condonation and approval of the practice of intentionally misrepresenting evidence were direct and proximate causes of Taylor's conviction and his subsequent imprisonment.

246. Because Keaton intentionally encouraged, condoned and approved the practice of intentionally misrepresenting evidence, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

247. Keaton was acting under color of state law when he encouraged, condoned and approved the practice of intentionally misrepresenting evidence.

248. By knowingly and intentionally encouraging, condoning and approving the practice of intentionally misrepresenting evidence, Keaton deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

249. Because Keaton knowingly and intentionally encouraged, condoned and approved the practice of intentionally misrepresenting evidence, Keaton is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

COUNT VIII: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (KEATON)

250. The allegations in the preceding paragraphs are incorporated herein by reference.

251. As Assistant Director of the Crime Lab, Keaton intentionally and in bad faith encouraged, condoned and approved the practice of some analysts, including Deaver and Taub, of withholding material exculpatory evidence by failing to disclose negative results of confirmatory tests.

252.    When Keaton encouraged, condoned and approved the practice of Deaver, Taub and other analysts of withholding exculpatory evidence, he could reasonably foresee that the withholding of exculpatory evidence would result in the wrongful conviction of criminal defendants, including Taylor.

253.    Keaton's encouragement, condonation and approval of the practice of withholding exculpatory evidence were direct and proximate causes of Taylor's conviction and his subsequent imprisonment.

254.    Because Keaton intentionally encouraged, condoned and approved the practice of withholding exculpatory evidence, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

255.    Keaton was acting under color of state law when he encouraged, condoned and approved the practice of withholding exculpatory evidence.

256.    By knowingly and intentionally encouraging, condoning and approving the practice of withholding exculpatory evidence, Keaton deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

257.    Because Keaton knowingly and intentionally encouraged, condoned and approved the practice of withholding exculpatory evidence, in reckless disregard of Taylor's constitutional rights, Keaton is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

## E.  CLAIMS UNDER 42 U.S.C. § 1983 AGAINST ELLIOTT FOR VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

### COUNT IX:  INTENTIONAL MISREPRESENTATION OF EVIDENCE (ELLIOTT)

258.    The allegations in the preceding paragraphs are incorporated herein by reference.

259.    As Director of the Crime Lab, Elliott intentionally and in bad faith encouraged, condoned and approved the practice of some analysts, including Deaver and Taub, of intentionally misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory testing.

260.    In encouraging, condoning and approving the practice of Deaver, Taub and other analysts of intentionally misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory testing, Elliott acted with reckless indifference to the constitutional rights of criminal suspects and defendants, including Taylor.

261.    When Elliott encouraged, condoned and approved the practice of Deaver, Taub and other analysts of intentionally misrepresenting evidence, he could reasonably foresee that the

misrepresentation would result in the wrongful conviction of criminal defendants, including Taylor.

262.　Elliott's encouragement, condonation and approval of the practice of intentionally misrepresenting evidence were direct and proximate causes of Taylor's conviction and his subsequent imprisonment.

263.　Because Elliott intentionally encouraged, condoned and approved the practice of intentionally misrepresenting evidence, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

264.　Elliott was acting under color of state law when he encouraged, condoned and approved the practice of intentionally misrepresenting evidence.

265.　By knowingly and intentionally encouraging, condoning and approving the practice of intentionally misrepresenting evidence, Elliott deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

266.　Because Elliott knowingly and intentionally encouraged, condoned and approved the practice of intentionally misrepresenting evidence, Elliott is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

COUNT X:　FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (ELLIOTT)

267.　The allegations in the preceding paragraphs are incorporated herein by reference.

268.　As Director of the Crime Lab, Elliott intentionally and in bad faith encouraged, condoned and approved the practice of some analysts, including Deaver and Taub, of withholding material exculpatory evidence by failing to disclose negative results of confirmatory tests.

269.　When Elliott encouraged, condoned and approved the practice of Deaver, Taub and other analysts of withholding exculpatory evidence, he could reasonably foresee that the withholding of exculpatory evidence would result in the wrongful conviction of criminal defendants, including Taylor.

270.　Elliott's encouragement, condonation and approval of the practice of withholding exculpatory evidence were direct and proximate causes of Taylor's conviction and his subsequent imprisonment.

271.　Because Elliott intentionally encouraged, condoned and approved the practice of withholding exculpatory evidence, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

272.　Elliott was acting under color of state law when he encouraged, condoned and approved the practice of withholding exculpatory evidence.

273. By knowingly and intentionally encouraging, condoning and approving the practice of withholding exculpatory evidence, Elliott deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

274. Because Elliott knowingly and intentionally encouraged, condoned and approved the practice of withholding exculpatory evidence, in reckless disregard of Taylor's constitutional rights, Elliott is liable in his individual capacity to Taylor for compensatory damages under 42 U.S.C. § 1983.

**F. CLAIMS UNDER 42 U.S.C. § 1983 AGAINST DEAVER, TAUB, NELSON, KEATON AND ELLIOTT FOR CONSPIRACY TO DEPRIVE TAYLOR OF HIS CONSTITUTIONAL RIGHTS, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

COUNT XI:  CONSPIRACY – 42 U.S.C. § 1983 (DEAVER, TAUB, NELSON, KEATON, ELLIOTT)

275. The allegations in the preceding paragraphs are incorporated herein by reference.

276. As set forth in detail above, Deaver, Taub, Nelson, Keaton and Elliott acted jointly and in concert with the intention of depriving Taylor of his constitutional rights.

277. Beginning in November 1991 and continuing through the remainder of their employment with the SBI, Deaver, Taub, Nelson, Keaton and Elliott, acting under color of state law, conspired to violate Taylor's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

278. The acts in furtherance of the conspiracy include, but are not limited to:

a.  Deaver and Taub jointly produced and submitted the incomplete and misleading SBI Report.

b.  Deaver and Taub jointly and falsely affirmed that "This report represents a true and accurate result of my analysis of the item(s) described."

c.  Nelson, Keaton and Elliott encouraged, condoned and approved Deaver's and Taub's practice of creating and submitting official SBI laboratory reports that falsely indicated the presence of blood, while concealing the negative results of confirmatory tests.

279. In conspiring to violate Taylor's civil rights, Deaver, Taub, Nelson, Keaton and Elliott acted in reckless indifference to Taylor's constitutional rights.

280. When Deaver, Taub, Nelson, Keaton and Elliott conspired to deprive Taylor of his civil rights, they could reasonably foresee that their conspiracy would result in Taylor's conviction.

281. The conspiracy between Deaver, Taub, Nelson, Keaton and Elliott was a direct and proximate cause of Taylor's conviction and his subsequent imprisonment.

282. Because of the conspiracy between Deaver, Taub, Nelson, Keaton and Elliott, Taylor was imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

283. The conspiracy between Deaver, Taub, Nelson, Keaton and Elliott deprived Taylor of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

284. Because Deaver, Taub, Nelson, Keaton and Elliott conspired to deprive Taylor of his constitutional rights, they are each liable in their individual capacities to Taylor for compensatory damages under 42 U.S.C. § 1983.

## II. STATE LAW

### A. CLAIMS UNDER THE NORTH CAROLINA CONSTITUTION

COUNT XII:  INTENTIONAL MISREPRESENTATION OF EVIDENCE (DEAVER)

285. The allegations in the preceding paragraphs are incorporated herein by reference.

286. Deaver intentionally and in bad faith misrepresented evidence against Taylor by creating and submitting the SBI Report in 1991 that falsely linked Taylor to the victim Jacquetta Thomas.

287. Deaver's intentional misrepresentation of evidence deprived Taylor of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

288. Because Deaver intentionally misrepresented evidence against Taylor, Deaver is liable in his official capacity to Taylor for compensatory damages under the North Carolina Constitution.

289. In 1992 and continuing through Taylor's trial in April 1993, Deaver, acting under color of state law, intentionally and in bad faith failed to correct the incomplete and misleading SBI Report.

290. In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008 and 2009, Deaver, acting

under color of state law, intentionally and in bad faith failed to correct the incomplete and misleading SBI Report.

291. Deaver's intentional failure to correct the incomplete and misleading SBI Report from 1992 through 2009 deprived Taylor of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

292. Because Deaver intentionally failed to correct the incomplete and misleading SBI Report from 1992 through 2009, Deaver is liable in his official capacity to Taylor for compensatory damages under the North Carolina Constitution.

## COUNT XIII: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (DEAVER)

293. The allegations in the preceding paragraphs are incorporated herein by reference.

294. Deaver intentionally and in bad faith withheld material exculpatory evidence by failing to disclose in the 1991 SBI Report that, after obtaining a positive result on presumptive serology tests, he obtained negative results on confirmatory tests, refuting the link he reported between Taylor and Thomas.

295. Deaver's intentional withholding of exculpatory evidence deprived Taylor of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

296. Because Deaver intentionally withheld exculpatory evidence, Deaver is liable in his official capacity to Taylor for compensatory damages under the North Carolina Constitution.

297. In 1992 and continuing through Taylor's trial in April 1993, Deaver, acting under color of state law, intentionally and in bad faith withheld the exculpatory results of the confirmatory tests.

298. In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008 and 2009, Deaver, acting under color of state law, intentionally and in bad faith withheld the exculpatory results of the confirmatory tests.

299. Deaver's intentional withholding of the exculpatory evidence from 1992 through 2009 deprived Taylor of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

300. Because Deaver intentionally withheld the exculpatory evidence from 1992 through 2009, Deaver is liable in his official capacity to Taylor for compensatory damages under the North Carolina Constitution.

31

COUNT XIV: INTENTIONAL MISREPRESENTATION OF EVIDENCE (TAUB)

301.    The allegations in the preceding paragraphs are incorporated herein by reference.

302.    Taub intentionally and in bad faith misrepresented evidence against Taylor by creating and submitting the SBI Report in 1991 that falsely linked Taylor to the victim Jacquetta Thomas.

303.    Taub's intentional misrepresentation of evidence deprived Taylor of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

304.    Because Taub intentionally misrepresented evidence against Taylor, Taub is liable in his official capacity to Taylor for compensatory damages under the North Carolina Constitution.

305.    In 1992 and continuing through Taylor's trial in April 1993, Taub, acting under color of state law, intentionally and in bad faith failed to correct the incomplete and misleading SBI Report.

306.    In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, Taub, acting under color of state law, intentionally and in bad faith failed to correct the incomplete and misleading SBI Report.

307.    Taub's intentional failure to correct the incomplete and misleading SBI Report from 1992 through 2009 deprived Taylor of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

308.    Because Taub intentionally failed to correct the incomplete and misleading SBI Report from 1992 through 2009, Taub is liable in his official capacity to Taylor for compensatory damages under the North Carolina Constitution.

COUNT XV: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (TAUB)

309.    The allegations in the preceding paragraphs are incorporated herein by reference.

310.    Taub intentionally and in bad faith withheld material exculpatory evidence by failing to disclose in the 1991 SBI Report that, after obtaining a positive result on presumptive serology tests, he obtained negative results on confirmatory tests, refuting the link he reported between Taylor and Thomas.

311.    Taub's intentional withholding of exculpatory evidence deprived Taylor of his liberty without due process of law in violation of his rights under the North Carolina

Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

312.     Because Taub intentionally withheld exculpatory evidence, Taub is liable in his official capacity to Taylor for compensatory damages under the North Carolina Constitution.

313.     In 1992 and continuing through Taylor's trial in April 1993, Taub, acting under color of state law, intentionally and in bad faith withheld the exculpatory results of the confirmatory tests.

314.     In each year after Taylor's conviction, including 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, Taub, acting under color of state law, intentionally and in bad faith withheld the exculpatory results of the confirmatory tests.

315.     Taub's intentional withholding of the exculpatory evidence from 1992 through 2009 deprived Taylor of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

316.     Because Taub intentionally withheld the exculpatory evidence from 1992 through 2009, Taub is liable in his official capacity to Taylor for compensatory damages under the North Carolina Constitution.

<u>COUNT XVI:  CONSPIRACY (DEAVER, TAUB)</u>

317.     The allegations in the preceding paragraphs are incorporated herein by reference.

318.     As set forth in detail above, Deaver and Taub acted jointly and in concert with the intention of depriving Taylor of his rights under the North Carolina Constitution.

319.     Beginning in November 1991 and continuing through the remainder of their employment with the SBI, Deaver and Taub, acting under color of state law, conspired to violate Taylor's rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

320.     The acts in furtherance of the conspiracy include, but are not limited to:

a.     Deaver and Taub jointly prepared and submitted the incomplete and misleading SBI Report.

b.     Deaver and Taub jointly and falsely affirmed that "This report represents a true and accurate result of my analysis of the item(s) described."

321.     The conspiracy between Deaver and Taub deprived Taylor of his liberty without due process of law in violation of Taylor's rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

322.  Because Deaver and Taub conspired to deprive Taylor of his constitutional rights, they are each liable in their official capacity to Taylor for compensatory damages under the North Carolina Constitution.

## B. CLAIMS FOR OBSTRUCTION OF JUSTICE

### COUNT XVII:  OBSTRUCTION OF JUSTICE (DEAVER)

323.  The allegations in the preceding paragraphs are incorporated herein by reference.

324.  Deaver prevented, obstructed, impeded and hindered public or legal justice by engaging in the acts set forth above, including but not limited to:

      a.  Intentionally misrepresenting evidence against Taylor by creating and submitting an official SBI report that falsely linked Taylor to the victim Jacquetta Thomas;

      b.  Intentionally withholding material exculpatory evidence by failing to disclose in the SBI Report that he obtained negative results on confirmatory tests, refuting the link that he reported between Taylor and Thomas;

      c.  In each year from 1991 through 2009, intentionally failing to disclose the misrepresentation of evidence and the withholding of exculpatory evidence in Taylor's case;

      d.  In such other ways as may be shown by the evidence.

325.  As a direct, proximate and foreseeable result of Deaver's obstruction of justice, Taylor was deprived of a fair trial and imprisoned for almost seventeen years for a crime he did not commit.

### COUNT XVIII:  OBSTRUCTION OF JUSTICE (TAUB)

326.  The allegations in the preceding paragraphs are incorporated herein by reference.

327.  Taub prevented, obstructed, impeded and hindered public or legal justice by the acts set forth above, including but not limited to:

      a.  Intentionally misrepresenting evidence against Taylor by creating and submitting an official SBI report that falsely linked Taylor to the victim Jacquetta Thomas;

      b.  Intentionally withholding material exculpatory evidence by failing to disclose in the SBI Report that Deaver obtained negative results on confirmatory tests, refuting the link that Deaver and Taub reported between Taylor and Thomas;

c.     In each year from 1991 through 2009, intentionally failing to disclose the misrepresentation of evidence and the withholding of exculpatory evidence in Taylor's case;

d.     In such other ways as may be shown by the evidence.

328.   As a direct, proximate and foreseeable result of Taub's obstruction of justice, Taylor was deprived of a fair trial and imprisoned for almost seventeen years for a crime he did not commit.

## COUNT XIX:  OBSTRUCTION OF JUSTICE (NELSON)

329.   The allegations in the preceding paragraphs are incorporated herein by reference.

330.   Nelson prevented, obstructed, impeded and hindered public or legal justice by the acts set forth above, including but not limited to:

a.     Encouraging, condoning and approving the practice of some analysts, including Deaver and Taub, of misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory testing.

b.     Encouraging, condoning and approving the practice of some analysts, including Deaver and Taub, of withholding material exculpatory evidence by failing to disclose negative results on confirmatory serology tests;

c.     In such other ways as may be shown by the evidence.

331.   As a direct, proximate and foreseeable result of Nelson's obstruction of justice, Taylor was deprived of a fair trial and imprisoned for almost seventeen years for a crime he did not commit.

## COUNT XX:  OBSTRUCTION OF JUSTICE (KEATON)

332.   The allegations in the preceding paragraphs are incorporated herein by reference.

333.   Keaton prevented, obstructed, impeded and hindered public or legal justice by the acts set forth above, including but not limited to:

a.     Encouraging, condoning and approving the practice of some analysts, including Deaver and Taub, of misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory testing

b.    Encouraging, condoning and approving the practice of some analysts, including Deaver and Taub, of withholding material exculpatory evidence by failing to disclose negative results on confirmatory serology tests;

c.    In such other ways as may be shown by the evidence.

334.    As a direct, proximate and foreseeable result of Keaton's obstruction of justice, Taylor was deprived of a fair trial and imprisoned for almost seventeen years for a crime he did not commit.

COUNT XXI:  OBSTRUCTION OF JUSTICE (ELLIOTT)

335.    The allegations in the preceding paragraphs are incorporated herein by reference.

336.    Elliott prevented, obstructed, impeded and hindered public or legal justice by the acts set forth above, including but not limited to:

a.    Encouraging, condoning and approving the practice of some analysts, including Deaver and Taub, of misrepresenting evidence by creating and submitting official SBI laboratory reports that falsely indicated the presence of blood despite negative confirmatory testing.

b.    Encouraging, condoning and approving the practice of some analysts, including Deaver and Taub, of withholding material exculpatory evidence by failing to disclose negative results on confirmatory serology tests;

c.    In such other ways as may be shown by the evidence.

337.    As a direct, proximate and foreseeable result of Elliott's obstruction of justice, Taylor was deprived of a fair trial and imprisoned for almost seventeen years for a crime he did not commit.

## C. CLAIM FOR CIVIL CONSPIRACY

COUNT XXII: CIVIL CONSPIRACY (DEAVER, TAUB, NELSON, KEATON, ELLIOTT)

338.    The allegations in the preceding paragraphs are incorporated herein by reference.

339.    As set forth in detail above, Deaver, Taub, Nelson, Keaton and Elliott acted jointly and in concert in a conspiracy to misrepresent evidence, withhold exculpatory evidence, violate Taylor's civil and constitutional rights, and obstruct justice.

340.    The acts in furtherance of the conspiracy include, but are not limited to:

a.    Deaver and Taub jointly prepared and submitted the incomplete and misleading SBI Report.

b.      Deaver and Taub jointly and falsely affirmed that "This report represents a true and accurate result of my analysis of the item(s) described."

c.      Nelson, Keaton and Elliott encouraged, condoned and approved Deaver's and Taub's practice of creating and submitting official SBI laboratory reports that falsely indicated the presence of blood, while concealing the negative results of confirmatory tests.

341.    As a direct, proximate and foreseeable result of the conspiracy of Deaver, Taub, Nelson, Keaton and Elliott, Taylor was deprived of a fair trial, wrongfully convicted of murder, and imprisoned for almost seventeen years for a crime he did not commit.

## DAMAGES

342.    As a direct and proximate result of defendants' violation of Taylor's civil and constitutional rights, obstruction of justice, and civil conspiracy, Taylor was deprived of a fair trial, wrongfully convicted of murder, and imprisoned for sixteen years, nine months and twenty-eight days for a crime he did not commit.

343.    As a result of Taylor's wrongful conviction and imprisonment, Taylor sustained physical injuries and sicknesses and other personal injuries, entitling him to recover compensatory damages. Those injuries include but are not limited to:

a.      permanent damage to vision;
b.      inadequate medical care;
c.      poor nutrition;
d.      physical pain and suffering;
e.      severe emotional distress;
f.      depression;
g.      humiliation, indignities and embarrassment;
h.      damage to reputation;
i.      damage to family relationships;
j.      loss of employment, wages and benefits;
k.      diminished earning capacity;
l.      restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic opportunity, physical activity, personal fulfillment, parental responsibilities, family relations, sexual relations, access to media and technology, reading, travel, enjoyment, and expression; and
m.      such other injuries as may be shown by the evidence.

344.    Defendants are jointly and severally liable in their individual capacities to Taylor for compensatory damages resulting from the violation of his civil rights, obstruction of justice and civil conspiracy.

345. Defendants Deaver and Taub are jointly and severally liable in their official capacities to Taylor for compensatory damages resulting from the violation of his rights under the North Carolina Constitution.

346. Taylor is entitled to recover his reasonable attorneys' fees and litigation expenses from defendants pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Based on the foregoing, Taylor prays for the following relief:

1. Compensatory damages from defendants, jointly and severally, in an amount to be determined at trial;

2. Reasonable attorneys' fees and litigation expenses from defendants under 42 U.S.C. § 1988;

3. Costs of court and interest as allowed by law;

4. A trial by jury on all contested issues of fact;

5. Such other and further relief as the Court may deem just and proper.

This the 28th day of June, 2011.

MARTIN & JONES, PLLC

BY: /s/ G. Christopher Olson
    E. Spencer Parris, NCSB 11042
    esp@m-j.com
    G. Christopher Olson, NCSB 21223
    gco@m-j.com
    410 Glenwood Avenue, Suite 200
    Raleigh, North Carolina 2760
    (919) 821-0005

PATTERSON HARKAVY, LLP

BY: /s/ Burton Craige
    Burton Craige, NCSB 9180
    bcraige@pathlaw.com
    Narendra K. Ghosh, NCSB 37649
    nghosh@pathlaw.com
    1312 Annapolis Drive, Suite 103
    Raleigh, North Carolina 27608
    (919) 755-1812
    **ATTORNEYS FOR PLAINTIFF**